N/S

**ORIGINAL**

Michael A. Hirst (CA Bar No. 131034)
michael.hirst@hirstlawgroup.com
Marisela Bernal (CA Bar No. 329589)
marisela.bernal@hirstlawgroup.com
HIRST LAW GROUP, P.C.
200 B Street, Suite A
Davis, California 95616
P: (530) 756-7700
F: (530) 756-7707

Heidi A. Wendel (NY BBO#2564938)
hwendel@heidiwendellaw.com
LAW OFFICE OF HEIDI A. WENDEL PLLC
43 W. 43rd Street, Suite 184
New York, NY 10036
P: (917) 854-1645

Attorney for *Qui Tam* Plaintiff
Satish Deshpande, M.D.

```
FILED
CLERK, U.S. DISTRICT COURT

11/20/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ GSA _____ DEPUTY
```

FEE PAID
NO CV 30

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF CALIFORNIA, *ex rel.* Satish Deshpande, M.D.,<br><br>    Plaintiff,<br>  v.<br><br>CONCORD HOSPITALIST GROUP; VERDUGO HILLS HOSPITAL; and DR. DEVINDER S. GANDHI, DR. GAREN DERHARTUNIAN, and DR. DAVID A. TASHMAN, in their individual capacities;<br><br>    Defendants. | **Civil Action No.** <br> 2:25-CV-11277-MWC-(BFMx)<br><br>**FALSE CLAIMS ACT COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUA NT TO 31 U.S.C. § 3730(b)(2)** |

Plaintiff-Relator Satish Deshpande ("Relator"), by his attorney Heidi A. Wendel, Law Office of Heidi A. Wendel PLLC, and Hirst Law Group, P.C., files this Complaint against defendants Concord Hospitalist Group, a physician-owned and operated company ("Concord"); Verdugo Hills Hospital, a hospital located in Glendale, California that contracted with Concord to provide hospitalist services ("Verdugo Hills" or the "Hospital"); Drs. Devinder S. Gandhi ("Gandhi"), and Garen

Derhartunian ("Derhartunian"), the co-presidents of Concord; and Dr. David A. Tashman ("Tashman"), medical director for the Emergency Department ("ED") at Verdugo Hills (collectively "Defendants"), on behalf of the United States of America and the State of California, alleging as follows:

## PRELIMINARY STATEMENT

1.     Relator brings this *qui tam* action seeking treble damages and penalties against Defendants for violations of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (the "FCA"), the California False Claims Act, Cal. Gov't Code §§ 12650, *et seq.*, (the "California FCA" or the "State FCA"), and the California Insurance Frauds Prevention Act, Cal. Ins. Code §§ 1871, *et seq.* (the "IFPA").

2.     Defendants have knowingly engaged in fraud. They do so by paying and receiving illegal kickbacks for patient referrals in violation of the FCA, California FCA, federal and state Anti-Kickback statutes, and the Stark law.  The illegal payments have resulted in numerous unnecessary and unreasonable hospital admissions.

3.     The fraudulent conduct, which includes structured and systematic kickback payments that vary based on the number of hospital admissions generated by Defendants, have caused damages to Government healthcare programs and commercial insurers, as well as to Government-insured and commercially-insured patients who suffer unreasonable and unnecessary hospitalizations designed solely to increase Defendants' revenue.

4.     Relator objected to the unnecessary hospital admissions, was warned to stop doing so, and was terminated when he continued to object to the fraud, as discussed further below.

5.     Before Relator was terminated, starting at least in June 2019 and throughout the time-period relevant to this Complaint, Concord was under contract with Verdugo Hills to provide hospitalist services to the Hospital.  To increase its

False Claims Act Complaint                          2

revenues, Verdugo Hills paid Concord extra for (1) every admission that exceeded a threshold of seven admissions for each hospitalist night shift, and (2) every patient visit, including admissions and subsequent hospital visits, that exceeded eighteen patient visits for each hospitalist day shift.

6.     To further the fraud, Relator and the other doctors in the Concord group were routinely pressured and directed by Concord management to admit patients from the ED, even though the admissions were not reasonable or necessary. Moreover, Concord paid Relator and the other hospitalists an extra $100 for each and every admission beyond the thresholds.

7.     To meet the demand for admissions, Defendants' fraud included falsifying medical records to substantiate unnecessary admissions for both observation and inpatient services, based on false diagnoses, among other fraudulent conduct described below.

8.     Relator was repeatedly directed by Concord management, particularly Defendants Dr. Gandhi, and Dr. Derhartunian, to admit patients from the ED whenever requested by the Hospital, for the purpose of increasing the Hospital's and Concord's revenue, even when an admission was not reasonable or necessary for the patient's condition and treatment. Dr. Gandhi told Relator that defendant Dr. Tashman insisted that Relator admit patients from the ED whenever requested by the Hospital,  regardless of whether the admission was warranted.

9.     Dr. Gandhi and Dr. Derhartunian led Relator to understand that increasing the Hospital's revenue through high levels of admissions was necessary to ensure that the Hospital would continue its contract with Concord for hospitalist services.

10.     In addition to Dr. Tashman, the other ED physicians at the Hospital likewise pressured Relator and other hospitalists under contract by Concord to admit

False Claims Act Complaint                    3

patients from the ED and to adopt the false diagnoses reported by the ED physicians to justify the admissions.

11.    Many patients whose admissions were improper were insured by Government payors, including Medicare and/or Medi-Cal (collectively the "Government Healthcare Programs"), and by commercial insurers.

12.    Induced by the illegal kickbacks, the medically unnecessary admissions include the following broad categories, among others:

- Improper admissions based on an unwarranted diagnosis of possible heart problems when no indicia of an acute heart problem requiring admission was present.  Many of these patients were admitted to the telemetry unit of the hospital, which is reimbursed at high levels under Government Healthcare Programs.

- Improper admissions based on purported syncope, or fainting, when there were no indicia to support a diagnosis of syncope or when any purported syncopal episode had occurred so long before the patient's arrival at the ED that it did not justify admission.

- Improper admissions for MRIs and other tests that were not warranted based on the patient's clinical presentation.

- Improper admissions for surgical consultations that were not warranted based on the patient's clinical presentation and testing in the ED.

- Improper admissions based on the patient lacking a social network outside the hospital to assist the patient.  This type of "social admission," also labeled at times as a "needs placement" at a facility such as a nursing home, is not permitted by the Medicare and Medicaid rules, as discussed further below.

13.    These medically unnecessary admissions were for the purpose of obtaining reimbursement from Government Healthcare Programs and commercial insurers, not for legitimate care and treatment based on individualized medical decision-making by providers.

14.    Concord's unnecessary admissions of the patients to enable the Hospital to obtain reimbursement from Government Healthcare Programs and commercial insurers constitute kickbacks by Concord to the Hospital. The kickbacks were paid in exchange for the Hospital continuing Concord's contract to provide

False Claims Act Complaint                    4

hospitalist services, to enable Concord to receive reimbursement from Government Healthcare Programs and commercial insurers for the hospitalists' services to the patients, and for direct extra compensation paid to Concord based on volume, as set forth above. Likewise, the Hospital's continuation of Concord's contract is a kickback by the Hospital to Concord in exchange for the improper admissions and for the payments received from Government Healthcare Programs and commercial insurers for the services themselves. These mutual kickbacks violate the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), and the California equivalent, Cal. Welf. & Inst. Code §14107.2. The payment or receipt of bribes or kickbacks also violates Cal. Bus. & Prof. Code §§ 650 and 650.1.

15. The illegal financial relationship between Concord and the Hospital also violated the Stark Law, 42 U.S.C. § 1395nn. Unless an exception applies, the Stark Law, *inter alia*, prohibits hospitals from submitting to Government Healthcare Programs claims for inpatient services as a result of patient referrals from a physician who has a financial relationship with the Hospital. 42 U.S.C. §1395nn; 42 C.F.R. § 441.357. The relationship between Concord and the Hospital does not fit into any of the Stark Law safe harbor exceptions. In addition, Concord violated the Stark Law by paying its hospitalists additional remuneration beyond their standard hourly pay based on the number of admissions they generated. 42 C.F.R. § 411.357(c)(2)(ii). Moreover, the Hospital also violated the Stark Law by providing Concord hospitalists with thousands of dollars a year in free meals at the Hospital in exchange for the unwarranted admissions. *Id.*

16. But for the kickback schemes, the contract between Concord and the Hospital would not have been renewed, and Concord would not have referred patients for medically unnecessary admissions. As a direct result, the Defendants each caused false claims to be submitted to the Government Healthcare Programs

False Claims Act Complaint                    5

and commercial insurers by falsely certifying their compliance with applicable law, including but not limited to AKS and Stark.

17.    Relator was terminated by Concord in retaliation for his complaints about the fraudulent admissions.  During the first approximately nine months of his tenure at the Hospital, Dr. Gandhi repeatedly admonished Relator for pushing back on admitting patients that the Hospital wanted admitted, even though admission was not warranted.  In early March 2022, Drs. Gandhi and Derhartunian told Relator that his objection to making admissions any time they were requested by the Hospital, regardless of whether they were warranted, was affecting the renewal of Concord's contract with the Hospital.  Relator was then placed on a Performance Improvement Plan stating, "There should be no refusal of admissions."  Relator continued to push back against pressure by Concord and the Hospital to unreasonably and unnecessarily admit patients, including admissions based on false diagnoses. Relator was ultimately terminated on November 24, 2022.  Concord's retaliation against Relator for objecting to the fraud and attempting to stop it violated the federal FCA, 31 U.S.C. § 3730(h), the California FCA, Cal. Gov't Code § 12653, and California Labor Code Section 1102.5.

**JURISDICTION AND VENUE**

18.    This Court has jurisdiction over this action under the FCA pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3730(a), as well as pursuant to the Court's general equitable jurisdiction.

19.    Venue is appropriate in this District pursuant to 31 U.S.C. § 3732(a) because one or more of the defendants can be found, resides, or transacts business in this District, and/or acts proscribed by 31 U.S.C. § 3729 occurred in this District. Venue is also appropriate in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the District.

False Claims Act Complaint                6

## THE PARTIES

**Plaintiff-Relator**

20.    Plaintiff-Relator ("Relator"), a specialist in internal medicine, was hired as an independent contractor by defendant Concord to work at defendant Verdugo Hills Hospital from June 2019 through November 2022. He was hired pursuant to a contract between Concord and the Hospital to provide the services of hospitalists - doctors with a specialty in providing inpatient hospital services.

21.    Relator's responsibilities included admitting patients, follow up of care to inpatients, consultations when requested by others at the Hospital, and discharging patients for whom either he or another Concord physician was the attending physician of record.

22.    As discussed above, as a result of his complaints to Concord and the Hospital about improper admissions, Relator was put on a Performance Improvement Plan dated March 18, 2022, telling him that he must stop refusing admissions requested by the Hospital even if they were unwarranted. He continued objecting to the improper admissions and was ultimately terminated on November 24, 2022.

**Defendant Concord Hospitalist Group**

23.    According to the National Plan and Provider Enumeration System ("NPPES") website of the Centers for Medicare & Medicaid Services ("CMS"), known as the NPPES NPI ("National Provider Identifier") registry, defendant Concord Hospitalist Group, NPI 1972036309, is located at 1812 Verdugo Boulevard, Glendale, California 91208-1407, which is the same address as defendant Verdugo Hills Hospital.   *See* https://npiregistry.cms.hhs.gov/provider-view/1972036309. Concord has an office in the Hospital, using all Hospital resources, including space, utilities, stationery and other resources of the Hospital, including coordinating the billing logistics of Concord physicians.

False Claims Act Complaint                                7

**The Individual Concord Defendants**

24.    Defendant Dr. Devinder S. Gandhi, NPI 1467492371, is a physician and co-owner and co-president of Concord Hospitalist Group, https://data.cms.gov/tools/medicare-revalidation-list/provider/O20170424002215. As discussed further below, Dr. Gandhi directed Relator to admit any patients that the Hospital, including ED physicians working at the Hospital, requested him to admit, regardless of whether it was reasonable and necessary to admit them based on their condition and treatment needs.

25.    Defendant Dr. Garen Derhartunian, NPI 1609133776, is a physician and co-owner and co-president of Concord, https://data.cms.gov/tools/medicare-revalidation-list/provider/O20170424002215.

26.    Drs. Gandhi and Derhartunian told Relator that the Hospital, including Dr. David A. Tashman, the medical director for the Emergency Department at Verdugo Hills, was unhappy with Relator for questioning admissions requested by the Hospital and adding notes to his documentation that questioned the diagnoses relied on to justify the admissions.  Drs. Gandhi and Derhartunian presented Relator the Performance Improvement Plan discussed above, and Dr. Derhartunian informed Relator on August 26, 2022, that his contract with Concord would be terminated in 90 days unless something changed.

**Defendants Verdugo Hills Hospital and Dr. David A. Tashman**

27.    Defendant Verdugo Hills Hospital is a hospital located at 1812 Verdugo Boulevard, Glendale, California 91208-1407.

28.    Dr. David A. Tashman, the medical director for the ED at Verdugo Hills, and the ED physicians and other medical personnel working under his direction, instructed Relator to admit patients who came to the ED regardless of whether their condition and treatment needs warranted inpatient admission.  According to Dr. Gandhi, Dr. Tashman told him that Relator's questioning of improper admissions

False Claims Act Complaint                    8

requested by the ED physicians at the Hospital was jeopardizing the contract between the Hospital and Concord for hospitalist services.

## STATUTORY AND REGULATORY BACKGROUND

### A.    The "Medical Necessity" Requirement

29.    The Medicare program provides health insurance for people who are 65 or older, as well as people with diabetes.  42 U.S.C. § 1395c.  The essential requirement of the Medicare program for reimbursement of services provided to Medicare enrollees is **medical necessity**:  the Medicare statute provides that "no payment may be made . . . for any expenses incurred for items or services . . . [that] are not reasonable and necessary for the diagnosis or treatment of illness or injury . . ." 42 U.S.C. § 1395y(a)(1)(A).

30.    Medicare reimburses providers for inpatient observation or other treatment only if "a physician certifies that such services are required to be given on an inpatient basis for such individual's medical treatment, or that inpatient diagnostic study is medically required and such services are necessary for such purpose[.]"  42 U.S.C. § 1395f(a)(3).

31.    The United States Department of Health and Human Services, Centers for Medicare & Medicaid Services, which administers the Medicare program and issues reimbursement guidance, defines a "reasonable and necessary" service as one that "meets, but does not exceed, the patient's medical need," and is provided "in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition . . . in a setting appropriate to the patient's medical needs and condition[.]"  CMS, Medicare Program Integrity Manual § 114 (2019).

32.    Admission of a patient to a hospital for inpatient treatment, whether for observation or other inpatient services, requires an admission order from a doctor "who is knowledgeable about the patient's hospital course, medical plan of care, and

False Claims Act Complaint                      9

current condition." 42 C.F.R. § 412.3(b). The doctor's decision must be "documented in the medical record in order to be granted consideration." *Id.* at 412.3(d)(1)(i). Medical necessity is a question of fact: "A physician's order or certification will be evaluated in the context of the evidence in the medical record." *Id*. at § 412.46(b). "No presumptive weight will be assigned to the physician's order under § 412.3 or the physician's certification . . . in determining the medical necessity of inpatient hospital services." *Id.*

33. Social admissions, which are admissions when there is no purported safe placement in the community available or are for the convenience of the patient, are not covered as inpatient Medicare Part A services. 78 Fed. Reg. 50947-48. These admissions are also not permitted under California's Medicaid Program, Medi-Cal. *See* https://www.justice.gov/archives/opa/press-release/file/1422311/dl.

34. Medi-Cal, a joint federal-state program, which, among other things, serves low-income individuals, requires that inpatient admissions, whether for observation or other inpatient services, be medically necessary and supported by documentation in the medical record, as outlined in the California Code of Regulations and enforced by Medi-Cal managed care plans. *See* https://www.justice.gov/archives/opa/press-release/file/1422311/dl. For hospital services to be covered, a Medi-Cal consultant must approve the request, which requires the beneficiary's physician to certify the need for inpatient care and provide justification for the admission based on the medical information submitted. *See id.*

35. Physicians and other health care practitioners are obligated by federal regulation to ensure the medical necessity of healthcare services they provide that may be reimbursed by Medicare or Medicaid. The regulations state as follows:

> 42 C.F.R. § 1004.10 Statutory obligations of practitioners and other persons.

False Claims Act Complaint                    10

It is the obligation of any health care practitioner or other person who furnishes or orders health care services that may be reimbursed under the Medicare or State health care programs to ensure, to the extent of his or her or its authority, that those services are

(a) Provided economically and only when, and to the extent, medically necessary;

(b) Of a quality that meets recognized standards of health care; and

(c) Supported by evidence of medical necessity and quality in the form and fashion and at such time that the reviewing QIO [Quality Improvement Organization] may reasonably require (including copies of the necessary documentation and evidence of compliance with pre-admission or pre-procedure review requirements ) to ensure that the practitioner or other person is meeting the obligations imposed by section 1156(a) of the Act.

Section 1156(a) of the Social Security Act defines the obligations of healthcare practitioners and providers to ensure that healthcare services are provided to Medicare beneficiaries in an economically efficient and medically necessary manner, and with professionally recognized quality.

36.    To enroll in the Medicare program, group practices must submit a Medicare Enrollment Application, Form CMS-855B. Form CMS-855B requires, among other things, signatories to certify:

I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in section 2A1 of this application. The Medicare laws, regulations, and program instructions are available through the Medicare Administrative Contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions . . . .

I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*See* CMS, Form CMS-855B, available at https://www.cms.gov/Medicare/CMS-Forms/CMSForms/Downloads/cms855b.pdf.

37.    An authorized official must sign the "Certification Statement" in Section 15 of Form CMS-855B, which "legally and financially binds this supplier

False Claims Act Complaint                    11

to the laws, regulations, and program instructions of the Medicare program." *Id.*

38.    Claims for payment to Government Healthcare Programs are submitted on a standardized Health Insurance Claim Form (CMS-1500), which states, "Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties." The form also requires the following certification:

> SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.
>
> NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

*Id.* Every claim must include this signed certification as to the individualized decision-making and medical necessity of the services and items listed.

**B.    The False Claims Act and California False Claims Act**

39.    The FCA imposes liability on any person who: "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, [or] (C) conspires to commit a violation of subparagraph (A) [or] (B)." 31 U.S.C. § 3730(b). The FCA defines a "claim" to include claims where the Government "will reimburse" the provider of services, such as providers of services to Medicare or Medicaid enrollees. *Id.* at 31 U.S.C. § 3729(b)(2).

40.    The terms "'knowing'" and 'knowingly' – (A) mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless

False Claims Act Complaint                              12

disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1).

41. The California FCA closely tracks the federal FCA. Cal. Gov't Code §§ 12650, *et seq*. The California FCA applies to the state portion of Medicaid losses caused by false or fraudulent Medicaid claims to the jointly federal-state funded Medicaid program, called Medi-Cal, or by a conspiracy to do so. *Id.* Defendants' acts alleged herein constitute violations of the California FCA.

**C.    The Federal and California Anti-Kickback Statutes**

42. The Medicare and Medicaid Fraud and Abuse Statute (also known as the "Anti-Kickback Statute"), 42 U.S.C. § 1320a-7b(b), prohibits any person or entity from making or accepting any "remuneration" to induce or reward payment for any services made under a federally-funded health care program. *Id.* The statute's prohibition applies to both sides of an impermissible kickback relationship (*i.e.*, the giver and the recipient of the kickbacks). "Remuneration" includes "anything of value in any form or manner whatsoever." HHS OIG, OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (July 29, 1991).

43. Claims for reimbursement for services that result from kickbacks are rendered false claims under the False Claims Act. 42 U.S.C. § 1320a-7b(b)(g). Amendments to the Anti-Kickback Statute in the Patient Protection and Affordable Care Act of 2010 ("PPACA") provide that "a claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of [the False Claims Act]." *See* Pub. L. No. 111-148, § 6402(f), 124 Stat. 119, 759 (2010), codified at 42 U.S. C. § 1320a-7b(g).

44. The California Anti-Kickback Statute, which applies to medical providers and entities participating in the California Medicaid program, Medi-Cal, is similar to the federal AKS in prohibiting kickbacks for medical services. *See* Cal. Welf. & Inst. Code § 14107.2.

False Claims Act Complaint                    13

## D.    The Stark Law

45.    The Stark Law, 42 U.S.C. § 1395nn, *inter alia*, prohibits hospitals from submitting claims to Medicare or Medicaid for "designated health services" that are the result of patient referrals by a physician who has a "financial relationship" with the hospital, subject to certain exceptions. *Id.* "Designated health services" include inpatient hospital services. *Id.* at § 1395nn(h)(6)(K). "Financial relationships" include "compensation arrangements" involving the payment of remuneration directly or indirectly to a referring entity. 42 U.S.C. § 1395nn(h)(1)(A) and (h)(a)(B) and 42 C.F.R. § 411.354(c). The California equivalent prohibits the same conduct. California Health and Safety Code Sections 13150-131052, California Code of Regulations, Title 22, Section 74645.

46.    The financial relationship between Concord and its hospitalists and the Hospital does not satisfy the requirements of any applicable exception to the Stark Law. 42 C.F.R. § 411.357. These hospitalists' referrals to the Hospital for the patients' inpatient hospital services induced by illegal payments were, therefore, prohibited, and the submission of claims to Government Healthcare Programs for the improperly referred services violated the Stark Law. Aside from other issues, the relationship could not satisfy any exception to the Stark Law because all of the Stark exceptions prohibit any payments based on "the volume or value of services." 42 C.F.R. § 411.357. The relationship between Concord and the Hospital was based on an agreement by Concord that its hospitalists would admit as any patients that the ED physicians at the Hospital asked them to admit, whether for observation or inpatient services. They did so in order to increase the volume of admissions at the Hospital and to increase reimbursement. In addition, by agreement with the Hospital, Concord paid its hospitalists working at the Hospital an additional $100 for each admission that exceeded seven admissions in each 12-hour night shift and an additional amount for each patient visit, including admissions and subsequent

False Claims Act Complaint                    14

hospital visits, that exceeded 18 visits in each 12-hour day shift. This compensation scheme violates the Stark Law by being based on the volume of services. Finally, the Hospital also provided Concord hospitalists with thousands of dollars in free meals every year, which is prohibited by the Stark Law. 42 C.F.R. § 411.357.

**E.     The California Insurance Frauds Prevention Act**

47.     To combat rampant insurance fraud, the California Legislature enacted the California IFPA, Cal. Ins. Code §§ 1871, et seq. The Legislature recognized the "potential for abuse and illegal activities" and designed the IFPA "to permit the full utilization of the expertise of the commissioner and the department so that they may more effectively investigate and discover insurance frauds, [and] halt fraudulent activities." Cal. Ins. Code § 1871(a). The Legislature also highlighted the negative impact of health insurance fraud in particular, advising that "it is believed that fraudulent activities account for billions of dollars annually in added health care costs nationally. Health care fraud causes losses in premium dollars and increases health care costs unnecessarily." *Id.* § 1871(h). Unlike the False Claims Acts, the IFPA encompasses false claims made to private health insurance companies.

48.     The IFPA permits civil enforcement of relevant provisions of the California Penal Code, either by the State of California or by any "interested person" on the state's behalf, i.e., a relator in a qui tam action. Specifically, the IFPA provides that any person who violates a provision of California Penal Code sections 549 or 550 is liable for civil penalties between $5,000 and $10,000, plus an assessment of not more than three times the amount of each claim. Cal. Ins. Code § 1871.7(b).

49.     The California Penal Code provides, in relevant part, the following regarding insurance fraud:

(a) It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:

…

False Claims Act Complaint                    15

(5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim.

(6) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.

…

(b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:

(1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled.

…

(h) This section shall not be construed to preclude the applicability of any other provision of criminal law or equitable remedy that applies or may apply to any act committed or alleged to have been committed by a person.

Cal. Pen. Code § 550.

50.     The California Penal Code provides, in relevant part, the following regarding illegal solicitations and referrals:

Any firm, corporation, partnership, or association, or any person acting in his or her individual capacity, or in his or her capacity as a public or private employee, who solicits, accepts, or refers any business to or from any individual or entity with the knowledge that, or with reckless disregard for whether, the individual or entity for or from whom the solicitation or referral is made, or the individual or entity who is solicited or referred, intends to violate Section 550 of this code or Section 1871.4 of the Insurance Code is guilty of a crime…

False Claims Act Complaint                    16

Cal. Pen. Code § 549. In other words, knowingly participating in a scheme with an individual or entity that intends to commit insurance fraud is also a crime.

51. The IFPA allows any person having knowledge of such illegal conduct to bring an action and to share in any recovery. The IFPA's filing and disclosure requirements mirror those of the federal and California FCAs. Cal. Ins. Code § 1871.7(e)(1).

## FACTUAL ALLEGATIONS

52. Since at least June 2019, when Relator began working as a hospitalist at Verdugo Hills Hospital under contract with Concord, Defendants Concord, Verdugo Hills, and the Individual Defendants have conspired to admit patients from the ED, for observation or other inpatient services, when admission was not warranted by the patient's condition and treatment needs.

53. Defendants entered into this conspiracy in order to fraudulently bill payors for revenue that was subsequently shared among them. The Hospital billed Government Healthcare Programs and commercial insurers for medically unnecessary admissions and paid illegal remuneration to Concord and Hospitalists for their participation. Concord incentivized its hospitalists to refer a high level of hospital admissions per shift by paying extra compensation for each admission beyond the threshold per shift and based on the volume of patient visits. ED physicians often falsified documentation substantiating nonexistent medical conditions or exaggerating patient risk to justify the medically unnecessary admissions. All Defendants caused or made false certifications to payors that they had each complied with applicable laws, including AKS and the Stark Law.

54. As detailed further below, if not for Defendants' illegal kickback scheme and false statements, numerous patients would not have been admitted to the Hospital and received unnecessary, wasteful services. Had the Government Healthcare Programs and commercial insurers been aware of Defendants' conduct,

False Claims Act Complaint                    17

they would not have paid for the medically unnecessary and/or useless services provided as a result of the admissions.

**A.    Payments to Concord and the Hospitalists Based Directly on the Number of Admissions and the Number of Patient Visits Violated the AKS and Stark Law**

55.    Concord violated the AKS and Stark Law by paying its hospitalists additional compensation based on the number of admissions they generated during the night shift and based on the number of patient visits, including admissions and subsequent hospital visits, on the day shift.  Concord had a fixed rate of $135 per hour of compensation for each of the 12 hours that Relator was hired to work per night shift.  However, he was also paid an extra $100 for each admission that he made during those 12 hours in excess of a seven-admission threshold.  The extra payments were made solely based on the volume of admissions.

56.    For example, Relator was paid an additional $100 payment for each patient he admitted that exceeded seven admissions during his 12-hour shift on the following dates, among others:

- January 11, 2022, one additional admission, an extra $100.
- February 9, 2022, one additional admission, an extra $100.
- March 9, 2022, four additional admissions, an extra $400.
- April 8, 2022, one additional admission, an extra $100.
- May 3, 2022, one additional admission, an extra $100.
- May 5, 2022, one additional admission, an extra $100.
- May 9, 2022, one additional admission, an extra $100.
- May 30, 2022, one additional admission, an extra $100.
- June 1, 2022, two additional admissions, an extra $200.
- June 2, 2022, three additional admissions, an extra $300.
- June 3, 2022, one additional admission, an extra $100.
- June 28, 2022, seven additional admissions, an extra $700.
- June 29, 2022, two additional admissions, an extra $200.
- July 25, 2022, three additional admissions, an extra $300.
- July 30, 2022, two additional admissions, an extra $200.
- August 22, 2022, one additional admission, an extra $100.
- August 23, 2022, one additional admission, an extra $100.
- August 24, 2022, nine additional admissions, an extra $900.
- August 25, 2022, one additional admission, an extra $100.
- September 19, 2022, three additional admissions, an extra $300.
- September 21, 2022, five additional admissions, an extra $500.
- September 24, 2022, two additional admissions, an extra $200.
- October 18, 2022, four additional admissions, an extra $400.

False Claims Act Complaint                18

- October 19, 2022, three additional admission, an extra $300.
- October 21, 2022, two additional admissions, an extra $200.
- October 22, 2022, one additional admission, an extra $100.

57.    On information and belief, other hospitalists who were under contract by Concord were also paid an additional $100 per admission that exceeded seven admissions in each 12-hour night shift worked by those hospitalists. Concord hospitalists who worked on the day shift – which was 7 a.m. through 7 p.m. – were paid additional compensation for each patient visit, including admissions and subsequent patient visits, after the first 18 visits on their day shift.

58.    In addition, Relator was told by Defendant Dr. Gandhi that the Hospital also paid Concord for each admission that exceeded the seven-admission threshold during each 12-hour night shift and for each patient visit that exceeded 18 visits on the day shift. The Hospital conspired with Concord to commit the fraud alleged herein, and the funds Concord paid in extra compensation to Hospitalists were only a fraction of the remuneration paid by the Hospital to Concord.

59.    The Stark Law's core purpose is to prevent conflicts of interest where a physician might order unnecessary services to increase his or her own financial gain.  When a physician's payment is based on the volume or value of referrals, it violates the Stark Law.  42 U.S.C. § 1395nn; 42 C.F.R. § 411.357(c)(2)(ii).  The Stark Law explicitly states that physicians' remuneration cannot take into account the volume or value of their referrals. *Id.*  Any compensation formula that directly or indirectly links remuneration to the number or value of referrals for designated health services violates the law. *Id.*

60.    Here, the additional compensation paid by Concord to Relator, and, on information and belief, to other hospitalists under contract by Concord, violated the Stark Law.

61.    Similarly, the compensation paid by Concord to Relator and other hospitalists per excess admission or patient visit violated the AKS as payments tied

False Claims Act Complaint                    19

to the volume of services.

**B.    The Hospital Provided Free Meals Worth More than $429 a Year to Concord's Hospitalists**

62.    The Hospital also violated the Stark Law by providing Concord hospitalists with many hundreds of dollars a year in free food/meals at the Hospital. Concord hospitalists are provided with approximately $200 per month in free meals/food at the Hospital cafeteria. This amounts to a bribe of over $2,400 per year to induce the hospitalists to make unwarranted admissions. The purpose of this benefit was to induce referrals for admission in violation of AKS. 42 U.S.C. § 1320a-7b(b). The bribe violates the Stark Law, which prohibits non-monetary compensation to physicians over the amount of $429 for free meals per calendar year. 42 C.F.R. § 411.357(m).

63.    Under the federal Stark Law, a hospital is permitted to provide non-monetary compensation to physicians who make referrals to the hospital of up to an aggregate amount of $429 per calendar year. *Id.* This includes non-monetary compensation in the form of meals. *Id.*

64.    As discussed above, the Stark Law provides that if a hospital has a financial relationship with a physician, as Verdugo Hills Hospital has with the Concord hospitalists, the physician may not refer patients to the hospital and the hospital may not bill for such referrals unless an exception to the Stark Law is met. *Id.* The Stark Law has an exception under 42 C.F.R. § 411.357 for non-monetary compensation to physicians for meals and other types of non-monetary compensation that limits such compensation to $429 annually. *Id.*

65.    As in the case of all of the Stark Law exceptions, the exception for non-monetary compensation provides that it only applies if the physician's compensation "is not determined in any manner that takes into account the volume or value of referrals or other business generated by the referring physician." *Id.* As discussed

False Claims Act Complaint                    20

above, aside from exceeding the $429 threshold, the Hospital fails to comply with the requirement that its gifts to the Concord hospitalists in the form of free meals not take into account the volume or value of referrals by the hospitalists.  Instead, the Concord hospitalists are required by the Hospital to refer patients who come to the ED for inpatient services whenever the Hospital demands that they be referred for such services, regardless of whether the admission is warranted. The Concord hospitalists are paid additional compensation for high levels of referrals as part of the conspiracy between Concord and the Hospital to boost inpatient admissions and improperly maximize reimbursement from Government Healthcare Programs and commercial insurers.  For Concord's part, the benefit of the bribe is the continuation of its contract with the Hospital to provide hospitalist services, as well as the payments from Government Healthcare Programs and commercial insurers for the services themselves.

**C.    The Hospital Falsely Certifies as to the Medical Necessity of Admissions and Creates False Records to Justify Unnecessary Services**

66.    The ED physicians at the Hospital do not have privileges to admit patients from the ED as inpatients.  Although ED physicians can request that a patient be admitted as an inpatient, whether for observation or for other inpatient services, the ultimate decision regarding whether admission of a patient is reasonable and necessary must be made by the hospitalists or specialists at the Hospital, such as surgeons or orthopedists, among others.  Hospitalists must use their independent judgment regarding whether a patient's care and treatment  require admission.

67.    However, in practice, the Hospital directed Relator to admit patients regardless of medical necessity and further directed him to report particular diagnoses to justify the admission, even if those diagnoses were not warranted by the patients' condition and treatment needs. This directive was intended to substantiate Defendants' false claims for payment to Government Healthcare

False Claims Act Complaint                    21

Programs and commercial insurers.

68.    While working at Verdugo Hills Hospital, Relator worked nights, from 7 p.m. to 7 a.m.  At the end of his shift, he "signed out" to the hospitalists from Concord on the day shift, of which there were usually two on any given day, along with a nurse practitioner.  During those sign-outs, Dr. Manvel Kondradzhyan, another Concord physician, and sometimes Dr. Narbeh Tovmassian, who was a co-owner of Concord but did not exercise management authority, as well as other Concord hospitalists, openly expressed their frustration about the lack of necessity of some of the inpatient admissions and their feelings of helplessness to stop it. During one sign-out, Dr. Kondradzhyan said to Relator, "When is this nonsense going to stop?"  Both Drs. Kondradzhyan and Tovmassian and other Concord hospitalists sometimes described admissions as facially unnecessary. One example was when a routine, uncomplicated urinary tract infection that did not need admission was presented by the ED physicians as a "roaring infection" to justify admission.  Drs. Gandhi and Derhartunian, on the other hand, although they appeared to recognize the lack of necessity for some of the admissions, would merely indicate that they would deal with it themselves as the daytime attending physician.

69.    Relator was repeatedly told by Defendant Dr. Gandhi, a co-president of Concord, to admit patients from the ED whenever requested for the purpose of increasing the hospital's revenue.  Relator was told to report diagnoses that would justify admissions and was admonished for including any material in patient records that, upon review by third-party payors, such as Government Healthcare Programs or commercial insurers, would create concern that the admission of the patient was, in fact, not reasonable nor necessary.

70.    Defendant Dr. Gandhi told Relator repeatedly that increasing the hospital's revenue through high levels of admissions was important to ensure that the Hospital would continue its contract with Concord for hospitalist services.  Dr.

False Claims Act Complaint                 22

Gandhi and Dr. Derhartunian told Relator that Dr. Tashman was very unhappy because of Relator's refusal to admit patients based solely on the Hospital's demands that he admit them. On March 18, 2022, Drs. Gandhi and Derhartunian instructed Relator, in a Performance Improvement Plan, that "There should be no refusal of admissions." Complaint ¶ 70.

71. In addition to Dr. Tashman, the other ED physicians at the Hospital likewise pressured Relator and other hospitalists under contract by Concord to admit patients from the ED as inpatients, whether for observation or other inpatient services. When Relator tried to tell the ED physicians, particularly Dr. Emeen Kiureghian, that they were violating the Inspector General's regulations on medical necessity, Dr. Kiureghian responded by saying "Let the Inspector General come and take care of the patients."

72. On April 1, 2022, Relator brought his concerns about the improper admissions and the role of Dr. Tashman to the attention of the Hospital's risk manager. Relator noted that his professional obligations pursuant to 42 C.F.R. § 1004 required him to provide care only when and to the extent it is medically necessary and supported by evidence of medical necessity and that he had a professional obligation to question unnecessary testing, such as testing for troponin without a clinical basis for the test, that were being conducted solely to attempt to justify admission of patients. He noted that at times the ED physicians failed to do basic, low-cost testing that would have ruled out conditions for which the Hospital instead ordered expensive tests such as CT scans and MRIs. He also discussed the problem of the Hospital insisting on admissions when both Relator and the patients had advocated that there was no need for admission. He set forth some examples of admissions that were not medically necessary. He also discussed the ED physicians' exaggeration and exacerbation of patients' symptoms to justify admitting them. However, despite receiving this information about the fraud, the Hospital did not

False Claims Act Complaint                              23

cease to engage in the fraud.

73.    The vast majority of patients whose admissions were improper were insured by Medicare and/or Medicaid ("Government Healthcare Programs"), or by commercial insurers.

**D.    Examples of Improper and Unnecessary Admissions by the Hospital**

74.    The examples of improper admissions set forth below all involve Medicare patients or dual eligible Medicare/Medicaid patients. However, these practices were implemented for all patients, including those with commercial insurance. Each of the examples below is an instance when the providers either falsified medical records to support nonexistent medical conditions or exaggerated patient risk to support medically unnecessary admissions to the Hospital. Each of the resulting claims for payment to Government Healthcare Programs were based on false information and included false certifications as to their compliance with applicable laws, including the AKS and Stark Law. But for the illegal remuneration paid to Concord and the hospitalists in exchange for admissions, these patients would not have been admitted and all subsequent services would not have been billed to and paid by Government Healthcare Programs. Had the Government Healthcare Programs been aware of these false statements, they would not have approved and paid the claims.

**Patient 1:    Improper Admission for Telemetry Based on False Diagnosis of Congestive Heart Failure**

75.    This patient was admitted improperly for telemetry on September 24, 2022, based on a false diagnosis of Congestive Heart Failure ("CHF") that was refuted by the patient's symptoms and his chest x-ray.  The telemetry unit provides continuous monitoring of a patient's ECG, an electrocardiogram that measures the electric activity of the heart, as well as the patient's respiratory rate and/or oxygen saturation, to determine if the patient is at risk of cardiac issues.  To justify the

False Claims Act Complaint                          24

admission, the hospital failed to provide the patient with medication in the emergency room that would have resolved his complaints.

76. The patient came to the emergency room primarily because of elevated blood pressure. The emergency room doctor noted that the symptoms, including leg edema, had been present for "a while" and the patient had no chest pain, shortness of breath or vomiting. The patient had no apparent history of heart failure. He was able to walk into the emergency room.

77. The ED physician's examination of the patient indicated that all the patient's vital signs were normal including respiratory rate and oxygen saturation, except that the ED physician claimed that he heard "faint crackles," although he admitted that there was "no resp[iratory] distress." The hospital radiologist who read the patient's chest x-ray found that there was "[n]o evidence of acute disease in the chest." The patient's laboratory results showed all normal values except for Pro BNP, which was elevated.

78. "Pro BNP" stands for N-terminal pro-brain natriuretic peptide. It is a protein hormone that can be released by the heart when it is under stress or strain. However, it is well-established that a patient should not be diagnosed with heart failure based on a Pro BNP test where there are no clinical manifestations of heart failure. As stated in a well-regarded text, "BNP values should not be used in isolation to determine either the need for admission or the appropriate level of care. BNP levels are not specific." McKesson 2016 (citing Yancy, *et al, Circulation*, 2013, 128 (16): e240-319; McMurray, N.Engl. J. Med. 2010; 362(3): 228-238; Klapholz, May Clin. Proc. 2009; 84(8): 718-729). "BNP is an adjunctive test," that should not be used alone to diagnose CHF. *Id.* "Factors such as age, sex, weight, and renal function can influence BNP levels." *Id.* Another highly regarded source on the clinical significance of the test states as follows:

Some patients show results that are inconsistent with their clinical

False Claims Act Complaint                              25

manifestations. BNP values can also vary according to age and sex, as well as the comorbidity and medications administered. This should always be kept in mind, and care should be taken not to commit diagnostic errors by relying on a single-marker test. . . . Therefore, it seems important to use the BNP test not as a stand-alone test but rather as an auxiliary diagnostic tool for heart failure, and to consider the patient's clinical condition in the diagnostic decision-making process.

Byung-Su Yoo, et al., *Clinical Significance of B-type Natriuretic Peptide in Heart Failure*, J. Lifestyle Medicine, 2014 Mar. 31, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC4390764/ (internal citations omitted). Many conditions other than CHF can cause elevated Pro BNP.

79. Nevertheless, the ED physician directed Relator to admit the patient for observation in the telemetry unit "for presumed new diagnosis of CHF."

80. When Relator examined the patient that same day, he found that the patient had no respiratory problems. He had no cough, no shortness of breath, and no wheezing. There were no crackles.

81. Considering how inconsistent the ED physician's finding of "faint crackles" was with the ED physician's other findings, as well as with the testing of the patient done in the ED, and with the examination of the patient not long afterwards by Relator, that finding was not credible and was made for the purpose of falsely supporting a wrongful diagnosis of CHF.

82. The Hospital, through its ED physicians under the direction of Dr. Tashman, routinely admits patients with no clinical indicia of CHF, based solely on an elevated Pro BNP test. In many cases, there is no reason for the Hospital even to do a Pro BNP test given the patients' condition. It is done for the purpose of attempting to support an improper diagnosis of CHF and thus admission of the patient.

83. To further support admission of the patient, the ED physician also failed to provide treatment that would have quickly reduced the patient's elevated blood pressure. The only treatment the patient received in the ED was one tablet of

False Claims Act Complaint                    26

Norvasc, an inadequate and inefficient treatment in that setting. The patient should have been given intravenous blood pressure-reducing medication. This treatment was withheld to justify admission of the patient.

84. Relator examined the patient and gave him intravenous hydralazine and Nitro paste, both of which brought down his blood pressure.

85. Although the ER physician directed Relator to admit the patient "for a new CHF," Relator found that there "was no clinical evidence of CHF."

86. The patient informed Relator that he had come to the ED because his blood pressure was high at home. The patient told Relator that he had some leg swelling but that it was "old, mild and does not bother him." As noted above, the patient had no shortness of breath; his breathing was normal. The patient's respiratory rate and oxygen saturation were normal.

87. Although the ED physician made a diagnosis of "new CHF," he did not give the patient any treatment for CHF. He did not give the patient any diuretic, which is the most important medicine for CHF. The ED physician knew that the patient did not in fact have CHF and made that false diagnosis to admit the patient. The fact that the patient had no shortness of breath or chest pain and even entered the ED walking, all confirm that the patient had no symptoms of CHF. In addition, as noted above, the patient's chest x-ray showed "[n]o evidence of acute disease in the chest."

88. In sum, the patient was admitted based on a false diagnosis of CHF. The patient was enrolled in Medicare and Medicaid and on information and belief, the Hospital submitted, or caused to be submitted, directly or indirectly, a claim to Medicare and/or Medicaid for the patient's care.

89. The patient was discharged on September 25, 2022.

**Patient 2:    Improper Admission for Telemetry Based on False Diagnosis of Hypotension and Fever**

90.    This patient was admitted improperly for telemetry on June 2, 2022 based on improper diagnoses of hypotension (low blood pressure), and fever. As discussed below, the medical records show that the patient did not have low blood pressure or fever at the time of admission, and there was no other basis for the patient to be kept at the hospital. The hospital sent the patient to the telemetry unit so that it could bill Medicare at a high rate.

91.    The patient came to the ED at approximately 4:30 pm with a complaint of low blood pressure. Although at the time of arrival her blood pressure was low, according to the ED report, by 7:00 pm her blood pressure had returned to normal, including when she was admitted to the hospital at 9:00 pm.

92.    Additionally, the patient had no fever. The patient denied having a fever, chills, or dizziness when she arrived at the hospital. Although she had had a urinary tract infection ("UTI") a few weeks prior to her arrival at the hospital, it had been treated with a full course of antibiotics. Her urinalysis at the hospital showed only a slight possibility of borderline UTI, but the patient had been started on another antibiotic the night before, which was the appropriate treatment for a possible borderline UTI.

93.    The patient had a long-standing urostomy and a urostomy bag due to a history of bladder cancer. Thus, although the patient's daughter-in-law indicated that the patient had previously had a positive test for bacteria in her urine, that is typical for patients who have a urostomy bag and did not indicate that the patient had anything more than a possible borderline UTI.

94.    The patient had no issues that would require admission for observation, particularly on the telemetry unit. She had no abdominal pain, nausea, vomiting, or diarrhea. She had no shortness of breath, cough, or sore throat. She was not dehydrated; in fact her urostomy bag was full of urine. Her extremities were warm

False Claims Act Complaint                         28

and she did not show any signs of shock or hypotension.

95. The fact that the patient did not need to be admitted to the hospital for observation in the telemetry unit is also evidenced by the hospital's discharge summary report after her stay. The patient was discharged on June 3, 2022, without any treatment in the Hospital and without any new medications. The patient's hospitalization in the telemetry unit was for purposes of maximizing revenue and was based on an improper diagnosis.

96. The patient was enrolled in Medicare and on information and belief, the Hospital submitted, or caused to be submitted, directly or indirectly, a claim to Medicare for the patient's care.

**Patient 3**: **Improper Admission for Telemetry Despite No Indicia of Heart Problems**

97. This patient was also admitted improperly for telemetry. In this case, the improper admission was based on a test showing elevated tropnonin, a protein, when the patient clearly only had a kidney stone and a distended bladder, neither of which required admission for telemetry.

98. The patient came to the hospital on September 24, 2022, complaining of pain in the right side of his abdomen. He was found to have a right-side kidney stone, which was the likely cause of the pain in the right side of his abdomen, as the ED physician acknowledged by noting, based on a CT scan of the patient, "right renal stone which could explain pain." The CT scan showed a right renal kidney stone without any obstruction. Because there was no obstruction, the patient would not have been admitted for the kidney stone alone.

99. The ED physician directed Relator to admit the patient for a potential heart problem even though there was no basis for finding that the patient could be having heart problems that would require continuous monitoring in the telemetry unit. The patient's pain was not even on the left side of his body; it clearly was not

False Claims Act Complaint                    29

related to a heart problem. None of the patient's symptoms or test results supported a diagnosis of a possible acute heart problem that would require admission.

100. The Hospital's justification for admitting the patient was a test that showed that the patient had elevated troponin. Troponin is a protein that can be released into the bloodstream for a number of reasons, not limited to cardiac conditions. As a result, "troponin level elevation is clearly not diagnostic of acute heart failure." N. Wetterstein and A. Maisel, "Role of Cardiac Troponin Levels in Acute Heart Failure," *Radcliffe Cardiology*, 2015, page 103.

101. The patient was discharged on September 26, 2022.

102. The patient was enrolled in Medicare and Medicaid and, on information and belief, the Hospital submitted, or caused to be submitted, directly or indirectly, a claim to Medicare and/or Medicaid for the patient's care at the Hospital.

103. This example is representative of many similar improper admissions by the Hospital based on elevated troponin levels in the absence of any indicia of heart problems based on the patient's clinical examination. The Hospital does unnecessary testing for troponin to support admissions, even when troponin testing is not warranted by the patient's condition.

**Patient 4:    Improper Admission for Telemetry Despite No Indicia of Heart Problems**

104. This patient was improperly admitted for telemetry on September 22, 2022, to rule out acute coronary syndrome ("ACS") when there were no symptoms of any acute heart problems. The patient came to the ED with minor flu-like symptoms and no history of chest pain, shortness of breath, or dizziness. He did not have a fever. For the purpose of attempting falsely to justify an admission for ACS, the patient was tested for troponins, which, as discussed above, is not standard when there are no symptoms of an acute heart problem. The patient tested negative for everything except troponin. The cardiologist's report noted that although the patient

False Claims Act Complaint                    30

had elevated troponin, he "d[id] not feel pt has clinical ACS."

105. The patient was discharged on September 25, 2022.

106. The Hospital's direction to Relator to admit the patient for ruling out ACS was improper and was for the purpose of obtaining reimbursement from Medicare. The patient was enrolled in Medicare and, on information and belief, the Hospital submitted or caused to be submitted, directly or indirectly, a claim to Medicare for the patient's care.

**Patient 5: Improper Admission for Telemetry Based on False Diagnosis of Ruling Out Arrythmia**

107. This patient was also admitted for telemetry without any basis. The ED physician claimed that the patient had possible arrythmia or another coronary syndrome when there was no clinical basis for that finding.

108. The patient arrived at the hospital on October 22, 2022. He had recently been diagnosed with multiple myeloma and was on chemotherapy prior to his arrival at the ED. He had also been suffering from an historical compression fracture of his thoracic vertebra for which an elective surgery had been planned. His wife indicated that the patient had had an episode of fainting 5-6 days before his arrival at the ED, but had been "back to baseline" for some time since then. He was on prescribed narcotics for pain.

109. The ED physician stated that "[t]here is no seizure-like activity" and that he "doubt[ed] this was a seizure" but that he "d[id] have some concern for arrhythmia versus other syncope causes."

110. This finding of possible arrythmia was a false finding to facilitate admission of the patient to the telemetry unit for continuous monitoring of his heart. The ED physician acknowledged that the patient's EKG showed "no concerning arrythmias." The CT scan of the patient's head was negative for any issues. The patient was "neurologically intact."

False Claims Act Complaint                    31

111. Relator examined the patient the following day, October 23, 2022. The patient informed Relator that he had had an episode of dizziness five days prior because he was getting high-dose steroids for his chemotherapy. The patient said he quickly recovered and did not become dizzy again.

112. Relator found that the patient's dizziness was related to his chemotherapy and his narcotics and gabapentin prescriptions. Relator adjusted the patient's narcotics and gabapentin prescriptions., which could have been done by the ED physician. The ED physician did not make these adjustments in the patient's medication so that he could give a false diagnosis of possible heart problems to admit the patient.

113. Relator was directed to admit the patient for a syncope work-up and to rule out Acute Coronary Syndrome (ACS) on the telemetry unit with continuous monitoring of his heart. There was no evidence that the patient had any acute heart problem such as arrythmia or any other coronary syndrome. The ED physician's finding that coronary syndrome should be ruled out was a false finding to justify an improper admission.

114. The patient was enrolled in Medicare, and, on information and belief, the Hospital submitted or caused to be submitted, directly or indirectly, a claim to Medicare for the patient's inpatient care.

115. The date of the patient's discharge is not known.

**Patient 6:    Improper Admission for Telemetry Without Any Basis**

116. This patient was admitted improperly for telemetry on May 7, 2022, without any basis for the admission.

117. The patient was brought to the ED with a minor bruise without bleeding due to a fall that resulted from excessive alcohol consumption. He had a very high blood alcohol level on arrival at the ED.

118. In testing in the ED, the patient's vital signs and oxygenation were

False Claims Act Complaint                    32

normal. His laboratory tests, performed at the time of admission, showed normal conditions of his heart and lungs. His tests were all negative for any acute issues other than alcohol consumption.

119. The ED physician diagnosed the patient with syncope, stating "EtOH [alcohol] on board but could also have had a syncopal episode. Will need admission and further evaluation."

120. There was no reason to admit the patient for possible syncope. When Relator examined the patient on May 8, 2022, the patient reported that prior to falling he did not feel dizzy and there was no vomiting or diarrhea or bleeding. The patient could have been observed for a few hours in the ED and then discharged, which is done in most hospitals in the case of patients who have consumed excessive alcohol.

121. The admission of the patient to the telemetry unit for continuous heart monitoring was improper. There was no evidence of any heart problem in the patient's presentation.

122. The patient was discharged on May 9, 2022.

123. The patient was enrolled in Medicare and, on information and belief, the Hospital submitted, or caused to be submitted, directly or indirectly, a claim to Medicare for the patient's care.

**Patient 7: Improper Admission for Telemetry Based on False Diagnoses**

124. This patient was improperly admitted to the telemetry unit on July 1, 2022, based on false diagnoses. The patient came to the ED with a history of chronic obstructive pulmonary disease ("COPD") complaining of shortness of breath. His son reported that the patient had been having difficulty moving around his home due to dizziness. He was wheezing but his wheezing improved with nebulizer treatment.

125. There was no evidence of any heart problems that would have justified admission for continuous heart monitoring in the telemetry unit. The patient's EKG was normal. The fact that the patient's wheezing improved with nebulizer treatment

False Claims Act Complaint    33

also indicated that the patient did not need to be admitted for his shortness of breath. The ED physician's diagnoses of respiratory failure, COPD with acute exacerbation, and acute dyspnea (shortness of breath), were not supported by the record. At the time of admission, the patient's testing indicated that his respiratory rate was normal, as was his oxygen saturation rate. In addition, the ED physician's diagnoses are contradicted by the fact that the patient's shortness of breath could be treated by a nebulizer.

126. Moreover, the patient did not need to be admitted for further treatment with a nebulizer; he had a nebulizer at home.

127. The ED physician nonetheless directed Relator to admit the patient to the telemetry unit.

128. When Relator examined the patient later on July 1, 2022, he found that nebulizer treatment would suffice to treat the patient's shortness of breath. He also adjusted the patient's medications to address his dizziness.

129. The patient was discharged on July 3, 2022.

130. The patient was enrolled in Medicare and, on information and belief, the Hospital submitted, or caused to be submitted, directly or indirectly, a claim to Medicare for the patient's care.

**Patient 8:    Improper Admission for Telemetry that was Unnecessary**

131. This patient was improperly admitted to the telemetry unit on September 19, 2022, purportedly for an MRI to rule out a stroke. The patient came to the ED complaining of vertigo. Her clinical examination was negative for any neurological problems other than the complaints of vertigo. She had no shortness of breath. Her NIH stroke score was zero, meaning there was no evidence of a stroke. Her lab tests were all normal. Her CT scans of the head and neck were normal.

132. Dr. Tashman's decision to admit the patient to the telemetry unit for observation, further evaluation, and for an MRI was for purposes of improperly

False Claims Act Complaint                    34

obtaining reimbursement for the services. The patient was already on Xarelto. The patient could not have an MRI because she had a Pacemaker. Even if she could have had an MRI, and it had shown that the patient had a stroke, no additional treatment for stroke was feasible since the patient was already receiving the maximum treatment to prevent strokes.

133. When Relator examined the patient later on September 19, 2022, her dizziness had subsided. The patient reported that her dizziness had lasted only a few hours. Relator believed that considering the patient's symptoms the likeliest causes of her symptoms were alcohol or substance abuse or side effects of medicine. The patient was also dehydrated, which would not be a basis for admission.

134. The patient was discharged on September 20, 2022.

135. The patient was enrolled in Medicare and, on information and belief, the Hospital submitted, or caused to be submitted, directly or indirectly, a claim to Medicare for the patient's care.

**Patient 9:    Improper Admission for Unnecessary Testing**

136. This patient was improperly admitted on May 8, 2022 for an MRI of the brain even though she had no abnormal neurological findings on clinical examination and a CT scan of her head was negative.

137. The patient came to the ED with complaints of dizziness, headache pressure, and blurred vision. The ED physician noted that other than the headache, she had no other neurological complaints, such as slurred speech, loss of consciousness, facial droop, difficulty swallowing, light sensitivity, ataxia, or confusion, palpitations (sensation of an abnormal or irregular heartbeat) or diaphoresis (excessive sweating, associated with acute medical conditions) and found that her vision was normal ("normal sensory"). His examination of the patient found that she was neurologically normal, including intact strength of the upper and lower extremities. The patient's NIH stroke scale was zero, meaning that she had

False Claims Act Complaint                35

not had a stroke.

138. The ED physician instructed Relator to admit the patient for an MRI based on a diagnosis of "peripheral vertigo." Relator, who examined the patient a few hours after the ED physician, found that the patient had no neurological problems on clinical examination other than the complaints described on arrival at the ED. The patient's complaints did not warrant admission for an MRI of her brain. The ED physician noted that the patient's apparent vertigo was "peripheral," meaning not originating in the brain. She was ambulatory with assistance and could have gone home since no treatment was needed in the hospital that could not have been provided at home. She was given only tablets of Meclizine, an antihistamine that is used to relieve vertigo, and no other treatment.

139. Contrary to standard medical practice, almost all patients with dizziness, even when suspected not to be central (inside the brain), but rather peripheral (outside the brain, such as caused by sinuses, ear infections, medications, etc.) are admitted to the Hospital for an MRI of the brain even when there is no reason to suspect that the patient has a brain problem.

140. The patient was discharged on May 9, 2022.

141. The patient was enrolled in Medicare and on information and belief, the Hospital submitted, or caused to be submitted, directly or indirectly, a claim to Medicare for the patient's inpatient care.

**Patient 10: Improper Admission for an Unnecessary Surgical Consult**

142. This patient was improperly admitted to the hospital as an inpatient for a spinal surgery consult without any basis.

143. The patient came to the ED on March 11, 2022, complaining of swelling in his lower extremities and pain in his back and right ribs after a fall that had happened three weeks before.

144. There was no basis for the admission because the patient's problems

False Claims Act Complaint 36

were due to weak bones, not any spinal problem.  The patient had an old compression fracture of his lower back that was due to osteoporosis, not to an injury.  The patient also had fatty liver from an alcohol problem, which likely contributed to his osteoporosis.

145.   The patient had no neurological problems on examination.  There was no issue of compression of his spinal cord caused by the fracture, as confirmed by the CT scan, which showed that there were "No neurological deficits or evidence of spinal cord damage on CT imaging" and no "extension into the [spinal] canal."  The compression fracture was of "age indeterminate," meaning that it was not acute.  In addition, the patient's labs were "unremarkable."

146.   The patient also had no weakness in his lower extremities.  He could walk using a walker.

147.   When the Relator saw the patient a few hours after he had first been seen in the ED, he noted that the leg swelling was likely due to a medication, amlodipine, that the patient was taking to assist in controlling his blood pressure.  Relator stopped that medication to alleviate the swelling, finding that the medication was not needed.  This could have been done in the ED, but was not, to justify admitting the patient.

148.   Rather than a surgery consult, the patient merely needed pain medication and physical therapy and Relator also recommended that he should initiate treatment for osteoporosis.  Relator advised the patient to avoid alcohol abuse and prescribed Ativan to prevent withdrawal symptoms, as well as thiamine and folate as vitamin supplements.

149.   The patient did not need to be admitted for a spinal surgery consult for his compression fracture.  That admission was improper and was done for the purpose of maximizing revenue.  This type of fracture, called a compression fracture, is due to the compression of the vertebra because of its softness.  In such a

False Claims Act Complaint                    37

compression fracture the front of the vertebra gets compressed more than the back, where the spinal cord is located. A compression fracture of this type almost never causes any neurological problems since the spinal cord and the spinal nerves, which are on the back of the vertebra, are not impacted. Therefore, a neurosurgical consultation is not needed. The unnecessary consultation was used as an excuse to admit the patient.

150. The patient was discharged on March 13, 2022. The patient was enrolled in Medicare and, on information and belief, the Hospital submitted, or caused to be submitted, directly or indirectly, a claim to Medicare for the patient's care.

**Patient 11: Improper Admission Based on False Diagnosis of Pneumonia**

151. This patient was improperly admitted on May 31, 2022, based on a false diagnosis of pneumonia.

152. The patient was sent from her nursing home for swallowing evaluation and chest compression. The ED physician found that the patient had no chest pain and no difficulty breathing. The patient's lung examination showed no wheezing, no rales, no rhonchi, and no other internal body sounds that could be indicative of any lung issues. He noted that "[t]he lung fields are clear." The patient's oxygen saturation was good. His overall impression was "no acute disease."

153. The ED physician ordered a chest x-ray which showed that the patient did not have pneumonia. The x-ray was read by the radiologist on the same day the patient was admitted, finding that her lungs were clear and there was no acute disease. The patient's vitals were normal; she had no fever, no elevated white count, and her heart rate was normal.

154. Despite no findings supportive of a diagnosis of pneumonia, the ED physician treated the patient with intravenous antibiotics, azithromycin and ceftriaxone. He diagnosed the patient with pneumonia or to rule out pneumonia.

False Claims Act Complaint                     38

155.   On examination of the patient later that same day, Relator found that the patient had a normal respiratory rate and had clear lung fields without any signs of significant infection in the form of an elevated white blood cell count or fever.

156.   The correct diagnosis for the patient was rhinovirus, a viral infection which does not need any treatment.  The patient's oxygen saturation was normal at the time of her arrival at the ED and subsequently.  She did not need the intravenous antibiotics that were given to her by the ED physician.

157.   The patient was discharged on June 1, 2022.  She was enrolled in Medicare and, on information and belief, the Hospital submitted, or caused to be submitted, directly or indirectly, a claim to Medicare for her treatment.

**Patient 12:  Improper Social Admission**

158.   This patient was also improperly admitted following her arrival at the ED on May 7, 2022, with complaints of stomach pain and nausea over the course of the last month and poor appetite.  The ED physician directed that the patient be admitted "for further work up of GI [gastrointestinal] bleed and dehydration," but there was no evidence that the patient had a GI bleed.  The patient indicated that she had had some black stool due to drinking chocolate Ensure.  She had not been vomiting blood or having bloody stools.  Her hemoglobin was normal; she was not anemic.  The Hospital's documentation of a GI bleed was false and done to justify admission.  Likewise, there was no evidence of dehydration.

159.   The ED physician also stated that the patient "[n]eeds admission for continuity of care."  He noted that the patient "lives alone, has not seen a doctor in years, and has no social support," and "has no food at home apparently."  This is not a medically accepted reason for admitting a person from the ED.

160.   Relator examined the patient later in the day on May 7, 2022, and found that she had no acute medical issues.  He referred her to a social worker at the Hospital.

False Claims Act Complaint                    39

161.   The social worker met with the patient on May 8, 2022.  She reported that the patient lived alone in an apartment complex on the second floor but that she denied having any difficulty using the stairs and that she was independent with the activities of daily living.  She reported that the patient still drove.

162.   The patient was discharged on May 9, 2022, without any home care services or home assistance of any kind.

163.   The patient was enrolled in Medicare and, on information and belief, the Hospital submitted, or caused to be submitted, directly or indirectly, a claim to Medicare for the patient's inpatient care.

**Patient 13:  Improper Admission Based on False Documentation**

164.   This patient was admitted based on false documentation of chest pain.

165.   The patient came to the ED of the Hospital on March 13, 2022, with a complaint of shortness of breath on exertion.  He reported that he had no chest pain.

166.   Despite the patient's assertion that he had no chest pain, and despite the findings of no recent heart problems, including a CT scan of his chest that showed no active issues, the ED physician falsely documented that the patient had chest pain and had been experiencing chest pain for six weeks prior to his admission.

167.   Relator examined the patient later in the day on March 13, 2022.  As in the ED, the patient again denied that he had any chest pain.  Relator noted that the patient was morbidly obese and that obesity hypoventilation might be a cause of his complaint of shortness of breath.  He also noted that the patient was already on medications that are the most potent cardiac medications for cardiac shortness of breath.

168.   The ED falsely documented that the patient had chest pain to justify admission.

169.   The patient was discharged on March 14, 2022.  He was enrolled in Medicare and, on information and belief, the Hospital submitted or caused to be

False Claims Act Complaint                    40

submitted, directly or indirectly, a claim for his inpatient care.

**Patient 14: Improper Admission Based on False Documentation of Urinary Tract Infection**

170. This patient was admitted based on false documentation of a urinary tract infection.

171. The patient came to the ED of the Hospital on March 9, 2022, with complaints of slurred speech, dizziness, and lethargy.

172. She had no fever or any other abnormal vital signs. Although she had purportedly had a urinary tract infection ("UTI") in the period prior to her arrival at the ED, when tested at the ED she had a normal white blood cell count and no other indications of a UTI. Her urine analysis ruled out any UTI.

173. Nevertheless, the ED physician diagnosed her with a "complicated UTI" and told Relator she "required admission." The diagnosis was false and was made for the purpose of admitting her to bill Medicare.

174. Relator examined the patient later in the day on March 9, 2022. Relator found that the patient's altered mental state was caused by the fact that she was on six mind-altering medications, purportedly for pain and other issues. He noted that "given the fact that there is no UTI the only thing that is causing . . . patient's altered mental status" was her "huge amount of medications." He sought to cut back on some of the medications to allow her to recover from the toxicity of the medication mix.

175. The patient was discharged on March 18, 2022. She was enrolled in Medicare and, on information and belief, the Hospital submitted or caused to be submitted, directly or indirectly, a claim for her care.

**E.      Relator Was Retaliated Against by Concord for Objecting to Improper Hospital Admissions**

176. As stated above, from the time he began work under his contract with Concord to provide hospitalist services at Verdugo Hills, Relator was admonished

by the Hospital and by Concord management, including the Individual Defendants, for questioning admissions requested by the Hospital's ED physicians and putting notes in the patient files questioning the admissions and the diagnoses that were falsely used to justify them.

177.  During the first approximately nine months of his tenure at the Hospital, Dr. Gandhi met with Relator several times to scold him about pushing back on admitting patients the Hospital wanted him to admit, even if the admission was not warranted.  In early March 2022, Drs. Gandhi and Derhartunian had a conference call with Relator and told him that his refusal to admit every patient requested by the Hospital for admission was jeopardizing the renewal of Concord's contract with the Hospital.  On March 18, 2022, Drs. Gandhi and Derhartunian put Relator on a Performance Improvement Plan stating, "There should be no refusal of admissions." On or about that same date, they had a conversation with Relator about it as well.

178.  On April 1, 2022, Relator wrote a letter to the risk manager at Verdugo Hills Hospital regarding the information that was conveyed to him in the phone call from Drs. Gandhi and Derhartunian on or about March 18, 2022.  As Relator stated in his letter, Drs. Gandhi and Derhartunian told Relator that Dr. Tashman had complained to them that Relator had been objecting to the admitting practices of the ED physicians; and had been documenting information in patients' charts that contradicted the ED physicians' documentation, which purportedly jeopardized payment for the Hospital from insurance companies, including Government Healthcare Programs and commercial insurers.  In his April 1, 2022, letter, Relator noted that he had professional obligations to provide care only when and to the extent it is medically necessary and supported by evidence of medical necessity and to question unnecessary testing, such as testing for troponin without a clinical basis. He noted in his letter that ED physicians at the Hospital were also questioning the troponin testing as being done without a clinical basis for the purpose of attempting

False Claims Act Complaint                    42

to justify improper admissions. He also discussed other concerns with the Hospital's practices, as discussed above in paragraph 72.

179. On August 26, 2022, Dr. Derhartunian, co-president of Concord, told Relator that his contract would be terminated in 90 days unless "anything . . . change[s]." The ostensible reason given in the email was that Concord was making a "staffing change" as of November 1st. However, there was no new person on the staffing schedule for the months of November and December. In fact, the same Concord hospitalist, Dr. Raya, was scheduled to work every night for the whole month of November, along with a nurse practitioner on some nights. This fact and the fact that the notice of termination is close in time to Relator's April 1, 2022 letter to Risk Management at the Hospital shows that Relator was terminated in retaliation for his complaints about the fraud. Relator's termination was finalized on November 24, 2022. Relator's conduct in objecting to the fraudulent scheme and attempting to stop it was protected conduct for purposes of the FCA, the California FCA, and the other statutes set forth below.

180. Concord's retaliation against Relator for whistleblowing violated the federal FCA, 31 U.S.C. § 3730(h), the California FCA, California Labor Code Section 1102.5, and the California Whistleblower Protection Act, California Government Code § 8547.1.

## FIRST CAUSE OF ACTION

### (FCA, 31 U.S.C. § 3729(a)(1)(A) – Presenting False Claims for Payment)

181. Plaintiff-Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

182. Plaintiff-Relator seeks relief against Defendants under Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

183. Through the acts set forth above, Defendants, acting with actual knowledge or with deliberate ignorance or reckless disregard for the truth, presented

False Claims Act Complaint                43

or caused to be presented, either directly or indirectly, false or fraudulent claims for payment to the federal Government when submitting claims for reimbursement by Medicare and Medicaid for inpatient care.

184. Defendants' violations of the Anti-Kickback Statute and the Stark Law are cognizable under the FCA.

185. The Government made payments to the Hospital, directly or indirectly, because of Defendants' conduct discussed above.

186. By reason of Defendants' false claims, the Government has been damaged in a substantial amount to be determined at trial, and a civil penalty is required by law for each violation.

**SECOND CAUSE OF ACTION**

**(FCA, 31 U.S.C. § 3729(a)(1)(B) – Creation or Use of False Statements or Records Material to a False Claim)**

187. Plaintiff-Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

188. By virtue of the above-described acts, among others, Defendants knowingly created or caused to be created, made, or used material false records or statements to cause false claims to be paid by Medicare and Medicaid.

189. Through the acts set forth above, Defendants, knowingly or acting in deliberate ignorance or in reckless disregard of the truth, made, used, and caused to be made and used, false records and statements material to a false or fraudulent claim in connection with the submission of claims for reimbursement under the Medicare and Medicaid programs.

190. By reason of Defendants' false claims, the Government has been damaged in a substantial amount to be determined at trial, and a civil penalty is required by law for each violation.

False Claims Act Complaint                    44

## THIRD CAUSE OF ACTION

## (FCA, 31 U.S.C. § 3729(a)(1)(G) – Reverse False Claim)

191.    Plaintiff-Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

192.    On behalf of the Government, Plaintiff-Relator seeks relief against Defendants under Section 3729(a)(1)(G) of the FCA.

193.    As set forth above, Defendants, knowingly made, used, or caused to be made or used false records and/or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the United States.

194.    By reason of Defendants' false claims and false statements, the Government has been damaged in a substantial amount to be determined at trial, and a civil penalty is required by law for each violation.

## FOURTH CAUSE OF ACTION

## (FCA, 31 U.S.C. § 3729(a)(1)(C) – Conspiracy)

195.    Plaintiff-Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

196.    On behalf of the Government, Plaintiff-Relator seeks relief against Defendants under Section 3729(a)(1)(C) of the FCA.

197.    As set forth in the allegations above, Defendants conspired together and with others to commit violations of the above-cited sections of the FCA, 31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(B) and 3729(a)(1)(G).

198.    By reason of Defendants' conspiracy, the Government has been damaged in a substantial amount to be determined at trial, and a civil penalty is required by law for each violation.

False Claims Act Complaint                    45

## FIFTH CAUSE OF ACTION

### (FCA, 31 U.S.C. § 3730(h) – Retaliation)

199. Plaintiff-Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

200. Plaintiff-Relator engaged in protected conduct as a whistleblower within the meaning of the FCA by opposing Defendants' improper admissions of patients from the Emergency Department to inpatient status when it was not reasonable and necessary. Instead, the admissions were induced by illegal kickbacks and Stark violations.

201. Plaintiff-Relator was retaliated against by Defendants because of his protected activity by being put on a specious and illegal performance improvement plan that directed him to make admissions whenever the Hospital demanded he do so even if he considered the admission to be unwarranted. Defendant Concord and the Individual Concord Defendants then refused to renew his contract and told him to leave the Hospital.

202. As a direct and proximate result of Defendants' actions, Plaintiff-Relator has suffered and will continue to suffer a loss of earnings and other employment benefits, whereby Plaintiff-Relator is entitled to general compensatory damages in amounts to be proven at trial.

203. Plaintiff-Relator has further suffered and will continue to suffer pain and mental anguish and emotional distress.

204. Plaintiff-Relator is entitled to litigation costs and reasonable attorney's fees resulting from Defendants' retaliation against him, along with other compensation necessary to make Plaintiff-Relator whole.

False Claims Act Complaint                46

## SIXTH CAUSE OF ACTION

**(California False Claims Act, Cal. Gov't Code § 12651(a)(1) – Presenting False Claims for Payment)**

205. Plaintiff-Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

206. Plaintiff-Relator seeks relief against Defendants under the California FCA, Cal. Gov't Code § 12651(a)(1).

207. Through the acts set forth above, Defendants, acting with actual knowledge or with deliberate ignorance or reckless disregard for the truth, presented or caused to be presented, either directly or indirectly, false or fraudulent claims to the State of California to obtain reimbursement to which the Hospital was not entitled for health care services provided under Medicaid and other state-funded health care programs.

208. The State of California made payments to the Hospital, directly or indirectly, because of Defendants' conduct discussed above.

209. By reason of Defendants' false claims, the State of California has been damaged in a substantial amount to be determined at trial, and a civil penalty is required by law for each violation.

## SEVENTH CAUSE OF ACTION

**(California FCA, Cal. Gov't Code § 12651(a)(2) – Creation or Use of False Statements or Records Material to a False Claim)**

210. Plaintiff-Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

211. By virtue of the above-described acts, among others, Defendants knowingly created or caused to be created, made, or used material false records or statements to cause false claims to be paid by Medicaid, including by the State of California.

False Claims Act Complaint                    47

212.   Through the acts set forth above, Defendants, knowingly or acting in deliberate ignorance or in reckless disregard of the truth, made, used, and caused to be made and used, false records and statements material to a false or fraudulent claim in connection with the submission of claims for reimbursement under the Medicaid programs.

213.   By reason of Defendants' false claims, the State of California has been damaged in a substantial amount to be determined at trial, and a civil penalty is required by law for each violation.

## EIGHTH CAUSE OF ACTION

### (California FCA, 31 U.S.C. § 12651(a)(7) – Reverse False Claim)

214.   Plaintiff-Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

215.   On behalf of the State of California, Plaintiff-Relator seeks relief against Defendants under the California FCA, Cal. Gov't Code § 12651(a)(7).

216.   As set forth above, Defendants, knowingly made, used, or caused to be made or used false records and/or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the State of California.

217.   By reason of Defendants' false claims and false statements, the State of California has been damaged in a substantial amount to be determined at trial, and a civil penalty is required by law for each violation.

## NINTH CAUSE OF ACTION

### (California FCA, Cal. Gov't Code § 12651(a)(8) – Beneficiary of Inadvertent False Claim)

218.   Plaintiff-Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

219.   Through the acts described above, the Hospital was a beneficiary of an inadvertent submission of a false claim, subsequently discovered the falsity of the

False Claims Act Complaint                    48

claim, and failed to disclose the false claim to the state within a reasonable period of time.

220.  By reason of Defendants' acts, the State of California has been damages, and continues to be damages, in a substantial amount to be determined at trial and California is entitled to the maximum statutory penalty for each and every violation alleged herein.

## TENTH CAUSE OF ACTION

### (California FCA, Cal. Gov't Code § 12651(a)(3) – Conspiracy)

221.  Plaintiff-Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

222.  Through the acts described above, Defendants conspired together and with others to commit violations of Cal. Gov't Code §§ 12651(a)(1), (2), (7), and (8).

223.  By reason of Defendants' conspiracy, the State of California has been damaged in a substantial amount to be determined at trial, and a civil penalty is required by law for each violation.

## ELEVENTH CAUSE OF ACTION

### (California FCA, Cal. Gov't Code § 12653 – Retaliation)

224.  Plaintiff-Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

225.  Plaintiff-Relator engaged in protected conduct as a whistleblower within the meaning of the California FCA by opposing Defendants' improper admissions of patients from the Emergency Department to inpatient status when it was not reasonable and necessary, and instead induced by illegal kickbacks and Stark violations.

226.  Plaintiff-Relator was retaliated against by Defendants because of his protected activity by being put on a specious and illegal performance improvement

False Claims Act Complaint                    49

plan that directed him to make admissions whenever the Hospital demanded he do so even if he considered the admission to be unwarranted.  Defendant Concord and the Individual Concord Defendants then refused to renew his contract and told him to leave the Hospital.

227.  As a direct and proximate result of Defendants' actions, Plaintiff-Relator has suffered and will continue to suffer a loss of earnings and other employment benefits, whereby Plaintiff-Relator is entitled to general compensatory damages in amounts to be proven at trial.

228.  Plaintiff-Relator has further suffered and will continue to suffer pain and mental anguish and emotional distress.

229.  Plaintiff-Relator is entitled to litigation costs and reasonable attorney's fees resulting from Defendants' retaliation against him, along with other compensation necessary to make Plaintiff-Relator whole.

## TWELFTH CAUSE OF ACTION

### (California IFPA, Cal. Ins. Code § 1871.7 – Commercial False Claims)

230.  Plaintiff-Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

231.  This is a claim for treble damages and penalties under the California Insurance Fraud Prevention Act, Cal. Ins. Code § 1871, *et seq.*, as amended.

232.  Defendants have violated the California IFPA, Cal. Ins. Code § 1871.7, and the California Penal Code Sections 549 and 550, by (a) referring patients for unnecessary admissions to Defendant Hospital in exchange for bonus payments, benefits, and other remuneration paid to Concord and the individual Defendants in violation of the federal AKS, California AKS, and EKRA, (b) conspiring to conceal those violations, (c) providing false information to commercial insurers, and (d) concealing the scheme from other providers, patients, commercial insurers, and the

False Claims Act Complaint                                50

State of California.  Each act caused false claims to be submitted to commercial insurers within the State of California.

233.  These commercial insurers, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, and unaware of the illicit referral scheme, have paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

234.  By reason of Defendants' acts, these commercial insurers have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

235.  Additionally, the State of California is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator, on behalf of the Government, respectfully requests that judgment be entered against Defendants as follows:

A.    That Defendants cease and desist from violating the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, the California False Claims Act, Cal. Gov't Code §§ 12650, *et seq.*, and the California IFPA, Cal. Ins. Code § 1871, *et seq.*;

B.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages sustained by the United States, the State of California, and commercial insurers because of Defendants' actions, plus the maximum civil penalty, as adjusted by inflation, for each violation of each of the FCAs and the California IFPA;

C.    That Plaintiff-Relators be awarded the maximum amount allowed pursuant to the FCAs and the California IFPA;

D.    That this Court order other injunctive relief, including a permanent injunction enjoining Defendants, their agents, successors, and employees from

False Claims Act Complaint                    51

engaging in each unlawful practice set forth above, and for such other injunctive relief as the Court may deem proper;

E.     That Plaintiff-Relators be awarded all attorneys' fees, costs, and expenses; and

F.     That the United States, the States, and Relators recover such other and further relief as the Court deems just and proper.

Dated:  November 18, 2025

By:   /s/ Michael A. Hirst
      Michael A. Hirst
      Marisela Bernal
      Hirst Law Group, P.C.
      Attorney for Relator
      200 B Street, Suite A
      Davis, CA 95616
      (530) 756-7700
      michael.hirst@hirstlawgroup.com
      marisela.bernal@hirstlawgroup.com

      Heidi A. Wendel
      Law Office of Heidi A. Wendel PLLC
      Attorney for Relator
      43 W. 43rd Street, Suite 184
      New York, NY 10036
      (917) 854-1645
      hwendel@heidiwendellaw.com

Michael A. Hirst (CA Bar No. 131034)
michael.hirst@hirstlawgroup.com
Marisela Bernal (CA Bar No. 329589)
marisela.bernal@hirstlawgroup.com
HIRST LAW GROUP, P.C.
200 B Street, Suite A
Davis, California 95616
P - (530) 756-7700
F - (530) 756-7707

Heidi A. Wendel (NY BBO#2564938)
hwendel@heidiwendellaw.com
LAW OFFICE OF HEIDI A. WENDEL PLLC
43 W. 43rd Street, Suite 184
New York, NY 10036
P: (917) 854-1645

Counsel for Plaintiff-Relator
Satish Deshpande

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF CALIFORNIA, *ex rel.* Satish Deshpande, M.D., <br><br> Plaintiff, <br><br> v. <br><br> CONCORD HOSPITALIST GROUP; VERDUGO HILLS HOSPITAL; and DR. DEVINDER S. GANDHI, DR. GAREN DERHARTUNIAN, and DR. DAVID A. TASHMAN, in their individual capacities; <br><br> Defendants. | Civil Action No: <br><br><br> **PROOF OF SERVICE** <br><br> **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

## <u>PROOF OF SERVICE</u>

I live in the County of Yolo, State of California.  I am a citizen of the United States, over the age of eighteen (18) years, and not a party to the within action. My business address is Hirst Law Group, P.C., 200 B Street, Suite A, Davis, California, 95616.

On November 18, 2025, I served the following document(s), described as

Proof of Service                                            53

**1. False Claims Act Complaint; and**

**2. Written Disclosure of Substantially All Material Evidence and Information in Relator's Possession Pursuant to FCA, 31 U.S.C. § 3730(b)(2), and Cal. Gov't Code § 12652(c)(3) with Exhibits**

as follows:

Hon. Pamela Bondi
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530-0001

Hon. Bilal A. Essayli
United States Attorney
Central District of California
ATTN: Civil Process Clerk
300 North Los Angeles Street, Suite 7516
Los Angeles, CA 90012

Hon. Ricardo Lara
California Insurance Commissioner
Attn: Agent for Service of Process
Government Law Bureau
300 Capitol Mall, Suite 1700
Sacramento, CA 95814

Hon. Nathan J. Hochman
Los Angeles County District Attorney
ATTN: Insurance Fraud
211 West Temple Street, Suite 1200
Los Angeles, CA 90012

I placed a true and correct copy of the foregoing document(s) in a sealed envelope addressed to each interested party as set forth above. I placed each such envelope, with postage thereon fully prepaid, certified mail, and return receipt requested, for collection and mailing in one of the United States Post Offices located in Davis, California.

Additionally, pursuant to consent from the recipient, I served the above documents via e-mail as follows:

Hon. Rob Bonta
California Attorney General
Office of the Attorney General
Brian V. Frankel, Supervising Deputy Attorney General
Division of Medi-Cal Fraud and Elder Abuse
brian.frankel@doj.ca.gov

Proof of Service                                   54

Amy Anderson, Deputy Attorney General
amy.anderson@doj.ca.gov

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on this 18th day of November, 2025, in Davis, California.

/s/Marisela Bernal
Marisela Bernal

Proof of Service                                         55